Filed 3/10/21  Taigod 3 v. Mandarin Realty 1 Corp. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| TAIGOD 3, LLC,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>MANDARIN REALTY 1 CORPORATION et al.,<br><br>        Defendants and Respondents. | B298793<br><br>(Los Angeles County<br>Super. Ct. No. BC647465) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yvette M. Palazuelos and Rupert A. Byrdsong, Judges.  Affirmed.

Lew Law Firm, Bill W. Lew, for Plaintiff and Appellant.

Interlink Law Group, Jane A. Rheinheimer, for Defendants and Respondents.

_____

Plaintiff and appellant Taigod 3, LLC (Taigod) appeals from a judgment following a jury trial in favor of real estate broker David Wan and his company Mandarin Realty 1 Corporation (Mandarin) in this action arising out of a forged signature in a 2002 real estate transaction.  The jury found that the statute of limitations on Taigod's claims had run before the action was filed.  On appeal, Taigod contends the trial court erred by instructing the jury on delayed discovery, rather than providing an instruction on fraudulent concealment that Taigod requested.  We conclude that the evidence did not support an instruction on equitable estoppel based on fraudulent concealment.  Even if it was error to refuse the instruction, however, Taigod has not shown a miscarriage of justice necessary to reverse the judgment on appeal, because there was no evidence to support that Taigod met its burden to show it exercised reasonable diligence to identify the wrongdoer.  Therefore, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**Purchase Agreement and Breach**

In 2002, Winners Investment Group One (Winners) owned a retail shopping center in Alhambra, California.  The shopping center's anchor tenant was Alhambra Bowling Center, Inc. (Bowling Center).  The lease agreement between

Winners and Bowling Center included a ten-year lease term expiring in August 2003, with an option to extend the lease for five years. The landlord was required to pay Bowling Center for tenant improvements made by Bowling Center when it vacated the premises.

Winners listed the property for sale through real estate salesperson Yevonne Luo, who was a friend of one of the owners of Winners. Luo brought the listing for the property with her when she began working for Wan at his real estate agency, Mandarin.

Ken Lai, Taigod's managing member, saw the property advertised in a Chinese newspaper and called Wan to discuss purchasing the property. Lai speaks Cantonese as his primary language and Wan speaks English and Cantonese. Lai made an offer on behalf of Taigod, and entered into a purchase agreement. Mandarin acted as a dual agent, representing both buyer and seller in the transaction. During escrow, Taigod reviewed the Bowling Center lease. Taigod refused to purchase the shopping center if it would be liable to pay for Bowling Center's tenant improvements.

A document referred to by the parties as escrow addendum B, dated February 28, 2002, was drafted by an unknown author. The addendum provided that upon Bowling Center's termination of the lease or expiration of the lease term, Winners would pay the buyer of the shopping center for Bowling Center's tenant improvements, restoration of the premises, and up to two months of the

shopping center buyer's lost rent for the time necessary to complete the restoration work, not to exceed a total of $250,000, which would be held in escrow. If an appraisal for the restoration work exceeded $250,000, Winners would deposit the additional amount in escrow. The document also stated that Bowling Center's rent would be $26,000 per month, which would increase after two months to $30,000 per month. If Bowling Center chose to exercise its option for a five-year extension, the monthly rent would be $35,000 per month for the first two months and then increase to $40,000 per month.

Wan gave the escrow addendum to Lai, who signed on behalf of Taigod. The two general partners of Winners signed the document on behalf of Winners. Wan signed on behalf of Mandarin. The signature of Bowling Center's owner, Yi-Chieh Chow, also known as Terry Chow, appeared on escrow addendum B on behalf of Bowling Center.

Bowling Center exercised its option to extend the lease for five years. In 2008, Bowling Center stopped paying rent. Bowling Center decided not to renew its lease at the expiration of the term in September 2008. Bowling Center requested payment for its tenant improvements. Taigod sought the increased rent provided for in the addendum and claimed that Winners was required to pay Bowling Center for the tenant improvements.

## Case 1

In October 2009, Bowling Center filed an action for breach of contract against Winners and Taigod. (Super. Ct. L.A. County, 2009, No. BC425001) (Case 1).) Winners and Taigod each filed cross-complaints against the other parties.

Lai learned in 2009 that although Chow admitted the signature on the escrow addendum was her signature, she claimed she did not sign the document. Lai called Wan and asked if he knew anything about the authenticity of escrow addendum B. Over the course of the proceedings in Case 1, Lai asked Wan many times whether he knew who had altered the document. Wan always said no.

Winners was dismissed from Case 1 prior to the beginning of a jury trial in March 2013. Lai was present for every day of the trial, although he did not understand the testimony entirely.

Wan testified. Bowling Center's attorney asked Wan if anyone from Mandarin had cut and pasted Chow's signature to the addendum. Wan answered, "I don't think so."

Lai was concerned about Wan's answer. He asked Wan in the hallway of the courthouse during a break later that day whether he or the people in his office had falsified the document. Wan said no.

The trial court instructed the jury on Bowling Center's theory that Taigod was responsible for Bowling Center's harm because Luo, Wan, and Mandarin had forged Chow's

signature to the escrow addendum.  Lai was present when the instruction was read to the jury.

The jury found in favor of Bowling Center and awarded damages of $200,315 and punitive damages of $104,583. Taigod paid a total of $1.1 million to Bowling Center, including attorney fees and costs.

## Case 2

Within the month of the judgment in the case between Bowling Center and Taigod, on March 28, 2013, Bowling Center filed an action against the real estate agency, Mandarin, its principal, Wan, and its agent, Luo, based on the evidence of forgery presented during Case 1.  (Super. Ct. L.A. County, 2013, No. BC504198) (Case 2).)  Bowling Center alleged several causes of action based on the theory that an employee of the broker forged Chow's signature on the escrow addendum.  Taigod was not aware of the case at the time of filing, but learned of Case 2 in September 2015, when Bowling Center's attorney Bill Lew subpoenaed Lai to testify as a percipient witness.

Lai testified at trial in September 2015.  While he was at the courthouse, he spoke to Wan in the hallway and asked if Wan or the people in his office had falsified escrow addendum B.  Wan answered no.  Luo also testified in Case 2 that she did not alter or forge the escrow addendum.

The jury returned its verdict on liability on September 4, 2015.  The jury found that Bowling Center could not have

discovered the identity of the forger before March 2010.  The special verdict form asked with respect to Bowling Center's claim for intentional interference with prospective economic relations, "Did David Wan or Yevonne Luo or Mandarin Realty 1 Corporation engage in wrongful conduct by cutting and pasting Escrow Addendum B or assisting or participating or conspiring in the scheme in cutting and pasting Escrow Addendum B?"  The jury answered, "Yes."  After further proceedings were conducted to determine the issue of punitive damages on September 8, 2015, judgment was entered on October 5, 2015, in favor of Bowling Center.

Bowling Center's attorney told Lai about the verdict in June 2016, and Taigod engaged the attorney to represent Taigod.

## Case 3

### A.  Complaint and Pre-Trial Rulings

On January 19, 2017, Taigod filed the complaint in this case against Mandarin, Luo and Wan.  (Super. Ct. L.A. County, 2017, No. BC647465) (Case 3).)  Taigod filed an amended complaint on April 24, 2017, alleging several causes of action, including fraud based on misrepresentation and concealment, negligent misrepresentation, inducing breach of contract, intentional interference with contractual relations and with prospective economic advantage,

negligent interference with prospective economic advantage, and conspiracy to defraud.

The trial court bifurcated the statute of limitations issue to be tried first with a separate jury. Taigod entered into a settlement agreement with Luo.

Mandarin and Wan filed a motion in limine to exclude testimony or evidence identifying them as forgers based on the findings of the jury in Case 2. The jury verdict in Case 2 did not determine which individual was responsible for pasting the signature on the escrow addendum. They argued that statements referring to them as forgers would be confusing to the jury and unjustly prejudicial to the defendants.

A hearing was held on January 17, 2019. Taigod opposed the motion to exclude evidence of the jury's verdict in Case 2. Taigod claimed the statute of limitations began to run when Taigod learned of the jury verdict in Case 2 in June 2016. Taigod argued that under the California Supreme Court case of *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926 (*Bernson*), although Taigod learned that a fraud had been committed during Case 1, the statute of limitations was tolled until Taigod had reasonable notice of the identity of the wrongdoer. The jury verdict would not be presented for the truth of the matter, but to establish Taigod's knowledge of the perpetrators which triggered the statute of limitations.

The trial court disagreed that the statute was tolled under *Bernson* until Taigod knew the identity of the

perpetrators. Wan and Mandarin argued that there was sufficient evidence to put Taigod on notice in Case 1, including the jury instruction that Bowling Center was claiming harm as a result of a forgery by Wan, Luo, and Mandarin as the agents of Taigod. In addition, the identity of the forger was limited to a finite number of people, not a wide universe of people.

The court questioned whether Taigod had taken steps to ascertain the identity of the forger. Taigod's attorney argued that whether Taigod took reasonable steps to ascertain the forger's identity was precisely the question to be presented to the jury. He noted that there were no findings in the first trial concerning the identity of the forger. He argued there would be no prejudice to the defendants, because the evidence of the jury verdict in Case 2 was simply to establish Taigod's knowledge for the purpose of the statute of limitations and could be excluded from the second phase of the trial on liability before a different jury.

The court stated that a finding on the identity of the forger was not required for the statute of limitations to start running. The court granted the motion to exclude evidence or testimony of whether the defendants forged the document, including the jury verdict in Case 2, and prohibited discussion of whether Wan and Mandarin forged the document. Lai could not testify that he learned Wan and Mandarin were the perpetrators of the forgery when attorney Lew told him in 2016 that the jury's verdict in Case 2 had found them liable.

9

Mandarin and Wan requested Judicial Council of California Civil Jury Instructions (CACI) 454[1] on the statute of limitations and CACI 1925 on delayed discovery in cases of fraud or mistake. As modified for trial, the instruction based on CACI 1925 stated: "Defendants Mandarin Realty 1 Corporation and David Wan contend that Plaintiff Taigod 3, LLC's lawsuit was not filed within the time set by law. To succeed on this defense, Defendants Mandarin Realty 1 Corporation and David Wan must prove that Plaintiff Taigod 3, LLC['s] claimed harm occurred before January 19, 2014. [¶] If Defendants Mandarin Realty 1 Corporation and David Wan prove that Plaintiff Taigod 3, LLC['s] claimed harm occurred before January 19, 2014, Plaintiff Taigod 3, LLC's lawsuit was filed on time if Plaintiff Taigod 3, LLC proves that before that date, it did not discover facts constituting the fraud or mistake, and with reasonable diligence could not have discovered those facts."

Taigod objected that the CACI instructions requested by the defendants on the statute of limitations were not applicable to the case and instead requested a special jury instruction that incorporated the concept of fraudulent concealment. The first two paragraphs of the special

---

[1] CACI 454 provides: "[*Name of defendant*] contends that [*name of plaintiff*]'s lawsuit was not filed within the time set by law. To succeed on this defense, [*name of defendant*] must prove that [*name of plaintiff*]'s claimed harm occurred before [*insert date from applicable statute of limitation*]."

10

instruction addressed the statute of limitations and delayed discovery, but Taigod added a third paragraph as follows: "Mandarin Realty 1 Corporation, David Wan, and Yevonne Luo are prevented from raising a statute of limitations defense if, as the result of their intentional concealment, Taigod 3, LLC was unable to discover, or through the exercise of reasonable diligence could not have discovered, the Defendants' actual identities as the alleged perpetrators of Taigod 3, LLC's claimed harm of the alleged cutting and pasting of Escrow Addendum before January 19, 2014."[2]

---

[2] Taigod's proposed special instruction provided in full: "Mandarin Realty 1 Corporation, David Wan and Yevonne Luo contend that Taigod 3, LLC's lawsuit was not filed within the time set by law. To succeed on this defense, Mandarin Realty 1 Corporation, David Wan and Yevonne Luo must prove that Taigod 3, LLC's claimed harm of the alleged cutting and pasting of Escrow Addendum B occurred before January 19, 2014. [¶] If Mandarin Realty 1 Corporation, David Wan and Yevonne Luo prove that Taigod 3, LLC's claimed harm of the alleged cutting and pasting of Escrow Addendum B occurred before January 19, 2014, Taigod 3, LLC's lawsuit was still filed on time if Taigod 3, LLC proves that before that date, Taigod 3, LLC did not discover, and did not know of facts that would have caused a reasonable person to suspect, that it had suffered harm that was caused by someone's wrongful conduct or Taigod 3, LLC did not discover, and a reasonable and diligent investigation would not have disclosed the alleged cutting and pasting of Escrow Addendum B. [¶] Mandarin Realty 1 Corporation, David Wan, and Yevonne Luo are prevented from raising a statute of limitations defense if, as the result of their

11

The trial court ruled that it would give the standard CACI 1925 and not modified jury instructions. The court noted that the directions specified that CACI 1925 should be used if the plaintiff alleged the delayed discovery rule applied to avoid the bar of the limitation defense. Taigod argued that CACI 1925 did not apply, because it directed the jury to determine when Taigod learned of the forgery and whether there were circumstances that delayed discovery of the forgery, rather than when Taigod learned the identity of the defendants to sue. The trial court denied the request to modify the standard instruction. The trial court also rejected Taigod's verdict form, which would have required the jury to make special findings, and strongly suggested the parties' use a general verdict form.

During a final status conference on May 31, 2019, Taigod objected again to using the delayed discovery instruction without including language from the *Bernson* case about the identity of the perpetrator. The court declined to reconsider the ruling on the instruction but stated that "to the extent that you don't have an instruction that's written out, that doesn't prevent the parties from arguing the evidence the way they want to argue it. [¶] If

---

intentional concealment, Taigod 3, LLC was unable to discover, or through the exercise of reasonable diligence could not have discovered, the Defendants' actual identities as the alleged perpetrators of Taigod 3, LLC's claimed harm of the alleged cutting and pasting of Escrow Addendum B before January 19, 2014."

you want to make your arguments and frame them based on the evidence, you're free to do so. You can be persuasive. There doesn't necessarily have to be a CACI on the point to make your point."

## B. Trial

A three-day jury trial began on June 17, 2019. During opening statements, Taigod's attorney argued that Lai knew everything he needed to know to file a lawsuit except the identity of the person who did it. A universe of people could have forged the document among the dozens of people working for the broker, the escrow company, and the seller, but Taigod could not sue the whole universe without risking a malicious prosecution action.

Wan testified at trial that as a real estate broker, he owns Mandarin and has 35 sales agents working for him. When Taigod refused to buy the property if it had to pay for tenant improvements, Wan spoke with Winners. Winners agreed to pay for the tenant improvements. He believes Lai's brother drafted the escrow addendum. The parties to the real estate transaction signed the escrow addendum with the documents at the escrow office, but Winners delivered the signature of Bowling Center to Wan. Wan has never seen the original document and it has never been produced in any of the lawsuits. He noted that the seller of the property is in Taiwan.

At the conclusion of Wan's testimony, the trial court solicited written questions from the jury for the court to ask of the witness. A juror asked when the lawsuits concluded, and Wan answered that it was 2016 or 2017. Another juror asked if it was Winners responsibility to provide the escrow account. Wan answered that it was. Asked who checks the validity of the documents in a contract, Wan answered that he checks the contract.

Lai testified with the assistance of an interpreter. A special interrogatory propounded in Case 3 asked when Taigod became aware of the existence of Case 2. Lai answered October 2013, but he was mistaken in his recollection and intended to answer October 2015.

During Lai's deposition in Case 3, he was asked, "[I]n October 2013, you learned that David Wan responded to request for admissions [in Case 2] and denied that he had forged the [escrow addendum]?" Lai responded, "Yes." After reviewing his deposition testimony, Lai corrected this response twice. The first correction stated that he learned in June 2016 and a second correction listed for the same question stated that he learned in 2015. Asked in the deposition if he knew about the second case in October 2013, he responded, "Yes." He later corrected his response to state that it was in 2015.

Lai did not ask Luo or either of the principals of Winners if they had anything to do with the alteration of the escrow addendum. A juror submitted a question asking the date that Case 2 was decided, as well as the outcome of the

14

case, and when Luo was no longer a party to the present case. The court asked the first and last questions only.

Luo testified that she worked for Mandarin for about a year. She did not alter escrow addendum B.

During closing arguments, defendants' attorney argued that Lai asked Wan several times whether he forged the document, because he had doubts and Wan's statements did not dissuade him. Defendants' attorney also highlighted the discrepancies in Lai's testimony concerning the date that he learned about Case 2.

Taigod's attorney argued that Lai acted with reasonable diligence in asking Wan whether Mandarin was involved in the forgery. Lai had a client relationship with Wan, while Chow had no direct relationship to Wan. He argued the statute of limitations never started to run, because Taigod did not know who to file an action against. He stated that Taigod filed the instant action because time was running out, but also stated that the clock was not even ticking yet when Taigod filed the lawsuit.

During deliberations, the jury asked, "What in the words of the law triggers the start of the time period referred to by the statute of limitations." The court referred the jury to review CACI 1925. Taigod continued to object to the instructions as failing to incorporate the holding of *Bernson*.

On June 19, 2019, the jury found in favor of the defendants and against Taigod on the statute of limitations. The trial court entered judgment in favor of the defendants

that day.  Taigod filed a timely notice of appeal from the judgment on June 25, 2019.

## DISCUSSION

### <u>Standard of Review</u>

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)  "'[T]he duty of the court is fully discharged if the instructions given by the court embrace all the points of the law arising in the case.  [Citations.]  [¶]  A party is not entitled to have the jury instructed in any particular phraseology and may not complain on the ground that his requested instructions are refused if the court correctly gives the substance of the law applicable to the case.  [Citation.]' [Citations.]" (*Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, 495.)

"We review de novo whether a challenged instruction correctly states the law." (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 298.)  The use of standard instructions approved by the Judicial Council, such as CACI, is "strongly encouraged." (Cal. Rules of Court, rule 2.1050(e).)  "If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury should be

16

instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless he or she finds that a different instruction would more accurately state the law and be understood by jurors. Whenever the latest edition of the Judicial Council jury instructions does not contain an instruction on a subject on which the trial judge determines that the jury should be instructed, or when a Judicial Council instruction cannot be modified to submit the issue properly, the instruction given on that subject should be accurate, brief, understandable, impartial, and free from argument." (*Ibid.*)

We view the evidence in the light most favorable to the party contending that a requested instruction should have been given, since the party was entitled to the requested instruction if the evidence could establish the elements of the party's theory of the case. (*Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.) We assume the jury, given correct instructions, might have drawn inferences more favorable to the appellant and rendered a verdict in that party's favor on those issues to which it received misdirection. (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 4–5 (*Veronese*).)

"A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a

17

reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*People v. Watson* (1956) 46 Cal.2d 818, 835.) [¶] Thus, when the jury receives an improper instruction in a civil case, prejudice will generally be found only "'[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . .'" (*LeMons v. Regents of University of California* [(1978)] 21 Cal.3d 869, 875, quoting *Robinson v. Cable* (1961) 55 Cal.2d 425, 428.)" (*Soule, supra,* 8 Cal.4th at p. 574.)

Assessing prejudice from an erroneous instruction requires evaluation of several factors, including "'(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' (*Pool* [*v. City of Oakland* (1986) 42 Cal.3d 1051,] 1069–1070, quoting *LeMons v. Regents of University of California*[, *supra,*] 21 Cal.3d 869, 876.)" (*Soule, supra,* 8 Cal.4th at pp. 570–571.)

## Fraudulent Concealment

The parties agree that the three-year limitations period for fraud provided in Code of Civil Procedure section

18

338, subdivision (d), is the applicable statute of limitations. At the defendants' request, the trial court instructed the jury on the rule of delayed discovery, but Taigod contends that the jury should have been instructed on fraudulent concealment instead. We conclude that although the delayed discovery rule did not apply to Taigod's theory of the case, any error in giving the legally correct delayed discovery instruction was harmless. The evidence at trial did not support an instruction on fraudulent concealment, but even if it was error to refuse the instruction, Taigod has not shown a miscarriage of justice.

## A. General Principles and Delayed Discovery

Competing policies are balanced through statutes of limitation. "One purpose is to give defendants reasonable repose, thereby protecting parties from 'defending stale claims, where factual obscurity through the loss of time, memory or supporting documentation may present unfair handicaps.' [Citations.] A statute of limitations also stimulates plaintiffs to pursue their claims diligently. [Citations.] A countervailing factor, of course, is the policy favoring disposition of cases on the merits rather than on procedural grounds." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).)

The statute of limitations generally begins to run when an action accrues, usually on the date of injury. (*Bernson*, *supra*, 7 Cal.4th at p. 931.) "Alternatively, it is often stated

19

that the statute commences 'upon the occurrence of the last element essential to the cause of action.'  [Citations.]" (*Bernson, supra*, 7 Cal.4th at p. 931.)

Under the discovery rule, the accrual date is postponed until the plaintiff discovers, or has reason to discover, the cause of action.  (*Fox, supra*, 35 Cal.4th at p. 807.)  A plaintiff has reason to discover a cause of action when the plaintiff has reason to suspect a factual basis for wrongdoing, causation, and harm.  (*Ibid*.)  Under the discovery rule, suspicion of one of these components, along with knowledge of any of the remaining components, generally triggers the statute of limitations.  (*Ibid*.)  "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid*.)

"The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."  (*Fox, supra*, 35 Cal.4th at p. 807.)  Plaintiffs are presumed to have knowledge of an injury if they are aware of circumstances that put them on inquiry or they had the opportunity to obtain knowledge from sources that were open to investigation.  (*Id*. at pp. 807–808.)  "In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation."  (*Id*. at p. 808.)

20

"A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery.  Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights.  So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111 (*Jolly*).) "It is not necessary that a plaintiff find the smoking gun before being charged with inquiry notice." (*The Police Retirement System of St. Louis v. Page* (2018) 22 Cal.App.5th 336, 343.)  "At this point it is necessary only to point out the oft-stated rule that it is the discovery of facts, not their legal significance, that starts the statute." (*Jolly*, *supra*, 44 Cal.3d at p. 1113.)

"While ignorance of the existence of an injury or cause of action may delay the running of the statute of limitations until the date of discovery, the general rule in California has been that ignorance of the identity of the defendant is not essential to a claim and therefore will not toll the statute. [Citations.]  As we have observed, 'the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.' [Citation.]  Aggrieved parties generally need not know the exact manner in which their injuries were 'effected, nor the identities of all parties who may have played a role therein.' [Citation.]" (*Bernson*, *supra*, 7 Cal.4th at p. 932.)

"Although never fully articulated, the rationale for distinguishing between ignorance of the wrongdoer and ignorance of the injury itself appears to be premised on the commonsense assumption that once the plaintiff is aware of the injury, the applicable limitations period (often effectively extended by the filing of a Doe complaint) normally affords sufficient opportunity to discover the identity of all the wrongdoers." (*Bernson*, *supra*, 7 Cal.4th at p. 932.)

In this case, the jury was given a correct instruction on the delayed discovery rule. The statute of limitations did not begin to run when the forgery was committed in 2002, because Taigod was not aware of it. Taigod discovered facts sufficient to put it on inquiry notice at some point between 2009 and March 2013: Taigod learned in 2009 that Chow claimed she never signed the addendum, and Bowling Center presented evidence of the forgery at trial in Case 1 in March 2013. The only fact that Taigod did not know at the time of trial in March 2013 was the identity of the perpetrator, but the perpetrator's identity was not an element of any cause of action. Applying the delayed discovery rule, the statute of limitations began to run no later than March 2013, and Taigod's action filed in 2017 was barred, unless another doctrine applied to further extend the statute of limitations.

Any error in giving the delayed discovery instruction, however, was harmless. The trial court instructed the jury to find the action was filed on time if Taigod proved that it did not discover facts constituting the fraud, and with

22

reasonable diligence could not have discovered those facts, before January 19, 2014. The court did not state that the identity of the perpetrator was not one of the facts constituting the fraud. The language of the instruction allowed Taigod to argue its theory that the statute of limitations did not begin to run before January 19, 2014, because the identity of the perpetrator was a necessary fact that could not have been discovered earlier.

## B. Fraudulent Concealment

Taigod contends the trial court erred when it failed to give the special instruction on fraudulent concealment that Taigod requested. Under the fraudulent concealment rule, a defendant who intentionally conceals his or her identity may be equitably estopped from asserting the statute of limitations to defeat an untimely claim. (*Bernson, supra,* 7 Cal.4th at p. 936.)[3] Fraudulent concealment is a "close

---

[3] The *Bernson* court described fact patterns in which the general rule may not apply because "as a result of the defendant's intentional concealment, the plaintiff is not only unaware of the defendant's identity, but is effectively precluded as a practical matter from ascertaining it through normal discovery procedures. May a thief, for example, who leaves no clues to his identity defeat an action by the rightful owner to recover the stolen property if the owner fails to find and serve the culprit within the applicable limitations period? Should the anonymous perpetrator of an assault and battery be immune from the victim's civil damage action

cousin" of the discovery rule. (*Id*. at p. 931.) "Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale 'is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an "otherwise diligent" plaintiff in discovering his cause of action.' [Citations.]" (*Ibid*.) "The rule of fraudulent concealment is applicable whenever the defendant intentionally prevents the plaintiff from instituting suit; the rule applies whether or not the action itself is based on fraud." (*Id*. at p. 931, fn. 3.)

"As we long ago observed, 'The statute of limitations was intended as a shield for [defendant's] protection against stale claims, but he may not use it to perpetrate a fraud upon otherwise diligent suitors.' [Citation.]" (*Bernson, supra*, 7 Cal.4th at p. 935.) "One should not profit from one's own wrongdoing. Accordingly, we hold that a defendant may be equitably estopped from asserting the statute of limitations when, as the result of intentional concealment,

---

after the time for identifying and serving Doe defendants has been exhausted? Or, alternatively, should the defendants in these circumstances be estopped from capitalizing upon their own misconduct under an equitable rule, akin to the rule of fraudulent concealment, which would toll the statute until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the defendant's identity?" (*Bernson, supra*, 7 Cal.4th at p. 933.)

the plaintiff is unable to discover the defendant's actual identity." (*Bernson*, *supra*, 7 Cal.4th at p. 936.)

"The rule of equitable estoppel includes, of course, the requirement that the plaintiff exercise reasonable diligence. [Citation.] Thus, under our holding the statute will toll *only* until such time that the plaintiff knows, or through the exercise of reasonable diligence should have discovered, the defendant's identity. Lack of knowledge alone is not sufficient to stay the statute; a plaintiff may not disregard reasonably available avenues of inquiry which, if vigorously pursued, might yield the desired information." (*Bernson*, *supra*, 7 Cal.4th at p. 936.)

"One factor which must be considered pertinent to the diligence inquiry is whether the filing of a timely Doe complaint would, as a practical matter, have facilitated the discovery of the defendant's identity within the requisite three-year period for service of process. (Code Civ. Proc., § 583.210, subd. (a); *Jolly*[,] *supra*, 44 Cal.3d at p. 1118.) Where the identity of at least one defendant is known, for example, the plaintiff must avail himself of the opportunity to file a timely complaint naming Doe defendants and take discovery. However, where the facts are such that even discovery cannot pierce a defendant's intentional efforts to conceal his identity, the plaintiff should not be penalized." (*Bernson*, *supra*, 7 Cal.4th at pp. 936–937.)

"It is only in those relative few [civil cases] where the defendant asserts a statute of limitations defense and the plaintiff claims that he was totally ignorant of the

defendant's identity as a result of the defendant's fraudulent concealment, that the issue will even arise; among those few, it will be the rare and exceptional case in which the plaintiff could genuinely claim that he was aware of no defendants, and even more rare that, given knowledge of at least one, he could not readily discover the remainder through the filing of a Doe complaint and the normal discovery processes." (*Bernson*, *supra*, 7 Cal.4th at p. 937.)

In *Bernson*, a member of the Los Angeles City Council learned he was the subject of a highly critical report. (*Bernson*, *supra*, 7 Cal.4th at p. 929.)  Bernson obtained a copy, but had no information about the author.  In February 1990, two reporters for the Los Angeles Times told him that the report had been prepared by defendant Browning–Ferris Industries of California, Inc. (BFI).  Bernson contacted BFI's attorney to confirm the information, but the attorney denied any knowledge of the report.  The attorney sent a letter to the Los Angeles Times, with a copy to Bernson, denying that BFI had direct or indirect responsibility for preparation of the report.  The attorney demanded that the newspaper retract attribution to BFI and advise Bernson that BFI was not involved.  Bernson accepted the attorney's representation.  In late May 1991, a different Los Angeles Times reporter informed an employee of Bernson that an independent political consultant prepared the report on behalf of BFI.  From this information, Bernson concluded the attorney's representations were false and he filed a libel action within one year.

The California Supreme Court concluded that "[a]lthough the normal rule is that ignorance of the identity of the defendant is not a basis for tolling the statute of limitations, under the particular circumstances this court determined that as a matter of equity, the defendant should be estopped from profiting from its own misconduct in precluding the plaintiff from ever ascertaining the identity of the defendant." (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1249.)

We note the differences between the doctrines of equitable tolling and equitable estoppel. (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383.) ""'Tolling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended. . . . Equitable estoppel, however, . . . comes into play only after the limitations period has run and addresses . . . the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period. [Equitable estoppel] is wholly independent of the limitations period itself and takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice.'" [Citations.]" (*Id.* at p. 383.) For a defendant to be equitably estopped from asserting a statute of limitations, the plaintiff must be

27

"directly prevented . . . from filing [a] suit on time." (*Id.* at p. 385.)

## C. Application

Taigod requested a special instruction on fraudulent concealment.[4] The issue of equitable estoppel based on

_____

[4] A modified version of CACI 456, which is intended for use when a plaintiff contends the defendant should be estopped from asserting the statute of limitations, might have been more appropriate for Taigod's theory of estoppel based on fraudulent concealment. CACI 456 currently provides: "[*Name of plaintiff*] claims that even if [*his/her/nonbinary pronoun/its*] lawsuit was not filed on time, [*he/she/nonbinary pronoun/it*] may still proceed because [*name of defendant*] did or said something that caused [*name of plaintiff*] to delay filing the lawsuit. In order to establish the right to proceed, [*name of plaintiff*] must prove all of the following: [¶] 1. That [*name of defendant*] said or did something that caused [*name of plaintiff*] to believe that it would not be necessary to file a lawsuit; [¶] 2. That [*name of plaintiff*] relied on [*name of defendant*]'s conduct and therefore did not file the lawsuit within the time otherwise required; [¶] 3. That a reasonable person in [*name of plaintiff*]'s position would have relied on [*name of defendant*]'s conduct; [and] [¶] 4. [That after the limitation period had expired, [*name of defendant*]'s representations by words or conduct proved to not be true; and] [¶] 5. That [*name of plaintiff*] proceeded diligently to file suit once [*he/she/nonbinary pronoun/it*] discovered the need to proceed. [¶] It is not necessary that [*name of*

28

fraudulent concealment of the wrongdoer's identity is an equitable issue for determination by the court, but the trial court may exercise its discretion to submit the issue to a jury and adopt the jury's factual findings. (See *Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 744–755 [equitable estoppel is an equitable issue for resolution by the court, but the trial court may empanel an advisory jury to make preliminary factual findings].) In this case, however, an instruction on fraudulent concealment was not supported by the evidence at trial. Even if we were to conclude that it was error to refuse Taigod's instruction, Taigod has not demonstrated a miscarriage of justice, because there was no evidence to support a finding by the trier of fact that Taigod exercised reasonable diligence to discovery the identity of the wrongdoer.

Taigod's only investigation of the identity of the forger was to ask Wan several times if he knew what had happened or was responsible for the forgery. When Wan denied responsibility, Lai took no further action to investigate. The universe of individuals who could have forged the signature on escrow addendum B was known and limited, unlike the wide universe of unknown individuals who could have authored the report in *Bernson*. Once BFI denied responsibility for the defamatory report in *Bernson*, the plaintiff in that case had no information from which to further investigate the identity of the wrongdoer and was

_____

*defendant*] have acted in bad faith or intended to mislead [*name of plaintiff*]."

effectively precluded from filing an action. In this case, there were three entities potentially responsible for the wrongdoer's act: the seller, the real estate agency, and/or the escrow agency. Taigod was on inquiry notice that one of these entities was the source of Taigod's harm. When Wan denied knowing anything about the forgery, however, Lai took no further action to learn the identity of the wrongdoer. Lai did not ask the seller, Luo, or other employees of the escrow agency for information about the creation, execution or transmission of the escrow addendum.

When the forgery was discovered during Case 1, in addition to simply asking parties for information, Taigod could have investigated the identity of the wrongdoer by adding causes of action, conducting discovery, and deposing the parties on the forgery issue under oath. After the conclusion of Case 1, in light of the limited number of entities who were potentially responsible, Taigod could have filed a timely Doe complaint and used the discovery procedures to uncover the defendant's identity. Had Taigod filed a Doe complaint and conducted discovery, Taigod would have learned that Bowling Center had filed an action against Wan, Luo, and Mandarin. At that point, Taigod could have consolidated the actions or joined in Bowling Center's action. Taigod did not investigate any of the reasonably available avenues of inquiry which, if vigorously pursued, might have yielded the information necessary to determine the identity of the wrongdoer.

We recognize that Wan and Mandarin, acting as the dual agent of Winners and Taigod in the purchase transaction, owed fiduciary duties to Taigod that they did not owe to Bowling Center. A broker acting as a dual agent owes fiduciary duties to both buyer and seller. (Civ. Code, § 2079.16; *Horiike v. Coldwell Banker Residential Brokerage Co.* (2016) 1 Cal.5th 1024, 1028 (*Horiike*).) A dual agent has a duty "to learn and disclose facts material to the property's price or desirability, including those facts that might reasonably be discovered by the buyer. (*Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 414– 416; see also *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 563 [buyer's agent has duty to verify the accuracy of information transmitted to the buyer or explain that it is unverified].)" (*Horiike, supra*, 1 Cal.5th at p. 1041.) The existence of a fiduciary relationship may have permitted Taigod to rely on Lai's representations about the transaction to a greater extent than a third party, and Wan made several representations to Lai outside of the court proceedings that he did not make to Chow. Conversely, however, Taigod may have had claims against Wan and Mandarin that could have been pursued even without having knowledge of the identity of the wrongdoer. For example, Taigod may have had a claim for breach of fiduciary duty based on the agent's duty to review the escrow documents, if it was questionable that a bowling alley could afford to pay an increase in rent of $14,000 per month, going from $26,000 to $40,000 per month, within 20 months after the

31

transaction closed. In the course of litigating any other claims against Wan and Mandarin, Taigod could have investigated the forgery as well.

Other than repeatedly asking Wan about the forgery, Taigod took no steps to discover the wrongdoer's identity. Even after Lai was subpoenaed to testify and learned Bowling Center had considered the evidence sufficient to pursue a lawsuit, Taigod took no steps to join Bowling Center's action or file an action of its own. Lai learned about Bowling Center's case and testified at trial, but Taigod did not even follow up to discover the jury's verdict for nine months. The trial court in Case 3 precluded evidence of the jury's verdict in Case 2, a ruling which Taigod has not appealed, but even if the trial court allowed admission of the jury's verdict in Case 2, it would not provide evidence of Taigod's diligence in investigating the identity of the wrongdoer. Taigod was on inquiry notice, but did not make inquiries other than asking informal questions of Wan. All of the evidence concerning the identity of the wrongdoer was known to Taigod by the conclusion of Case 1; there is no evidence that any additional facts about the identity of the forger were discovered following the conclusion of Case 1. Taigod not only waited for the facts to come to it, but waited for a jury finding of liability to come to it as well. There was simply no showing of reasonable diligence to justify applying equitable estoppel in this case.

32

## DISPOSITION

The judgment is affirmed.  Respondents David Wan and Mandarin Realty 1 Corporation are awarded their costs on appeal.


MOOR, J.


We concur:



BAKER, Acting P. J.



KIM, J.